NATHAN W. KELLUM
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN 38117
(901) 684-5485 telephone
(901) 684-5499 – Fax
nkellum@crelaw.org

DOUGLAS J. MASON
Wyoming Bar #6-3400
Mason & Mason, P.C.
P.O. Box 785
Pinedale, WY 82941
307-367-2133
dmason@masonlawpinedale.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

**TODD SCHMIDT,**

      Plaintiff,

**v.**

**EDWARD SEIDEL**, in his official capacity as the President of the University of Wyoming, and **RYAN O'NEIL,** individually and in her official capacity as Dean of Students for the University of Wyoming,

      Defendants.

**CIVIL ACTION NO.: 2:23-cv-00101-NDF**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

Plaintiff Todd Schmidt ("Schmidt") brings a Motion for Preliminary Injunction against Edward Seidel ("Seidel"), in his official capacity as the President of University of Wyoming ("UW"), and Ryan O'Neil ("O'Neil"), individually, and in her official capacity as Dean of Students for UW (referred to jointly as "UW Officials"), seeking relief from application of UW policy § 2.B.4 or any other policy or practice invoked to censor disfavored views, and, particularly, Schmidt's opinion on the sex status of Artemis Langford. Schmidt further seeks relief from application of UW policy § 5.B.15 or any other policy or practice used to bar or suspend Schmidt

from access to a breezeway table in the UW Union due to him expressing his opinion about the sex status of Artemis Langford.

## STATEMENT OF FACTS

Schmidt is a resident of Laramie, Wyoming, a Christian, and an elder at Laramie Faith Community Church. (Verified Complaint [VC], ¶ 13; Declaration of Todd Schmidt, ¶¶ 2-3, attached to Motion for Preliminary Injunction [MPI] at Exhibit [Ex.] "A").   As an outreach ministry of his church, Schmidt frequents UW to convey the merits of Christianity to college students.   (VC, ¶¶ 14-15, 20; Ex. A, ¶¶ 4, 10).  He also shares his beliefs on various social and political issues of the day from his religiously oriented perspective. (VC, ¶¶ 16-19; Ex. A, ¶¶ 5-9). To facilitate this ministry, Schmidt has secured a table in the UW Union breezeway on a regular basis, usually on Fridays, for over 17 years. (VC, ¶ 21; Ex. A, ¶¶ 11, 29).   UW Union allows university departments, campus groups, outside entities, and non-profits to use a breezeway table for speech purposes. (VC, ¶¶ 22-26; Ex. A, ¶¶ 12-14; UW Union Polices and Operating Procedures, attached to MPI as Ex. "B").

The Union breezeway table is essential for Schmidt's communicative efforts.  (VC, ¶¶ 27, 34-36; Ex. A, ¶ 15).  Though he occasionally preaches on campus grounds, Schmidt much prefers the one-on-one and small group discussion opportunities that come with the Union table. (VC, ¶¶ 27-28; Ex. A, ¶ 16).  He usually puts DVDs, books, and booklets on the table as a conversation starter. (VC, ¶¶ 29-30; Ex. A, ¶¶ 17-19).  And Schmidt has historically placed a sign with Velcro strips and plastic lettering on the front of his table to encourage friendly dialogue. (VC, ¶ 31; Ex. A, ¶ 20). The lettering options give Schmidt a chance to convey different messages about his Christian beliefs and draw attention to his ministry.  (VC, ¶¶ 31-32; Ex. A, ¶¶ 21-28; Photographs of Schmidt's breezeway table with a sign, attached to MPI as Exs. "C", "D", "E", & "F").

In August of 2022, a UW student named Artemis Langford participated in a sorority recruitment process known as rush.  (VC, ¶¶ 39-40; First Amended Verified Complaint, *Westenbroek, et. al v. Kappa Kappa Gamma, et. al.*, ¶¶ 120-123, attached to MPI as Ex. "G").  Though born a biological male, and appearing like a male, Langford self-identifies as female, and wished to join a sorority.  (VC, ¶¶ 41-47; Ex. G, ¶¶ 114-119).  During rush, Langford visited each of the four sororities, including the Omicron Gamma chapter of Kappa Kappa Gamma (KKG), and KKG invited Langford to participate in their continuing bid process.  (VC, ¶¶ 48-49; Ex. G, ¶¶ 122-128).

On September 19, 2022, during chapter meeting, KKG leaders announced to sorority members they would take a vote on Langford's membership that day. (VC, ¶ 50; Ex. G, ¶¶ 129-136).  Numerous members did not want Langford in their sorority because they believed the organization was reserved for females and did not consider Langford a female. (VC, ¶ 51; Ex. G, ¶ 136).  However, KKG leaders altered the voting process to favor Langford's admittance and Langford received a bid.  (VC, ¶¶ 52-54; Ex. G, ¶ 135).  This result upset many KKG members, who were particularly concerned about Langford being and living in the sorority house.  (VC, ¶¶ 56-57; Ex. G, ¶¶ 137-142).  Notwithstanding, Langford was granted access to house areas typically restricted for females only, leading to many KKG members and initiates to feel threatened and unsafe. (VC, ¶¶ 58-61; Ex. G, ¶¶ 143-149).

Soon after securing the bid, Langford contributed to a news article in the *Branding Iron*, the UW university newspaper where Langford worked as a staff writer.  (VC, ¶¶ 62-63; *Branding Iron* article, attached to MPI as Ex. "H").  The article reported on Langford joining KKG, explaining the change in KKG guidelines to allow biological males who identify as females to join the sorority. (Ex. H).  Consisting primarily of quotes from Langford, the story served as a platform

for advancing the idea that biological males identifying as females should be able to join sororities. (VC, ¶¶ 65-69; Ex. H).  Other publications picked up the Langford story, relaying the content and quotes, and identifying Artemis Lanford as the transgender individual joining a sorority. (VC, ¶ 70; *Cowboy State Daily* article attached to MPI as Ex. "I"; *Washington Examiner* article attached as Ex. "J").

*National Review* also published a story about the Langford issue, but from the perspective of an existing KKG sorority member who opposed Langford's forced insertion. (VC, ¶¶ 71-72, 85-86; *National Review* article, attached to MPI as Ex. "K").  The unidentified KKG sorority member described how chapter leaders disregarded members concerns who were uncomfortable with Langford, believing the sorority should remain for biological females only. (Ex. K).  This member opined Langford received a bid due to the questionable voting process and was dismayed Langford had permission to contribute to the *Branding Iron* story while sorority rules prevented her and others from sharing their viewpoints. (Ex. K).  This member further addressed worries about Langford living in the same sorority house with them, who, according to this member "had made no efforts to physically look like a girl." (Ex. K).  This circumstance, said the KKG member, caused 10 out of 12 pledges to object to sleeping in the same room with Langford. (Ex. K).

On November 3, 2022, Schmidt heard a national podcast and radio show known as the Markley, van Camp, and Robbins show, who presented the Langford sorority bid as one of their top stories of the day.  (VC, ¶¶ 85-86; Ex. A, ¶¶ 31-33).  The hosts identified Artemis Langford by name as a biological male joining the KKG sorority and criticized UW's supporting this effort. (VC, ¶¶ 87-88; Ex. A, ¶¶ 34-36, 38). They identified the *Branding Iron* as the outlet reporting this news.  (VC, ¶¶ 88-91; Ex. A, ¶ 37).

4

Schmidt had no prior knowledge about the bid or Langford and was disturbed by the tidings. (VC, ¶¶ 89, 92, 95; Ex. A, ¶ 39). Wanting to learn more, Schmidt went to the *Branding Iron* offices at UW and obtained a copy of the newspaper containing the Langford article to read for himself. (VC, ¶¶ 93-94; Ex. A, ¶¶ 40-41, 45; Ex. H). Schmidt believed the article was slanted, favoring Langford's admission. (Ex. A, ¶¶ 41-42). And he strongly disagreed with Langford's and KKG's conclusions in the story about the propriety of transgender students joining sororities, believing the arrangement contravenes biblical teaching and common sense. (VC, ¶¶ 94-95; Ex. A, ¶¶ 43-44). After reading more about it, and thinking and praying about it, Schmidt became convinced that he needed to share his biblical views on the Langford issue. (VC, ¶¶ 96-97; Ex. A, ¶¶ 46, 48-51; Ex I; Ex. J; Ex. K). Schmidt resolved to address the issue through his sign and lettering at a breezeway table in the Union on Friday, December 2. 2022, with the slogan: "God created male and female and Artemis Langford is a male." (VC, ¶¶ 98, 103; Ex. A, ¶¶ 52-55). He believed this phrase was biblical and appropriate. (VC, ¶¶ 99-101; Ex. A, ¶ 54). His message was not designed to target Langford personally or offend him or anyone else. (VC, ¶ 102; Ex. A, ¶ 56). Rather, he wanted to convey this message to the UW student community as a whole as way to offer his beliefs on the issue. (VC, ¶ 102; Ex. A, ¶ 57)

Schmidt arrived at his reserved table in the UW Union around 10:30 a.m. that morning of December 2, put out his DVDs, books, and booklets, and set out his sign in front of the table. (VC, ¶¶ 104-106; Ex. A, ¶¶ 58-62). About 15 minutes later, several students gathered in front of Schmidt's table in an apparent attempt to block others from seeing the sign. (VC, ¶¶ 107-109; Ex A, ¶¶ 63-65). Different students voiced support for his message. (VC, ¶¶ 110-112).

Subsequently, UW Dean of Students Ryan O'Neil approached Schmidt and informed him that his sign violated § 2.B.4 of the UW Union policies. (VC, ¶¶ 113-117; Ex. A, ¶¶ 66-72). She

showed Schmidt a copy, claimed his message violated this rule for supposedly going against UW mission, and ordered Schmidt to remove Langford's name from the sign under the threat of police sanction. (VC, ¶¶ 118-121, 125; Ex. A, ¶¶ 71-78).  O'Neil did not explain to Schmidt how the sign violated the university mission or how the restrictive action comported with the First Amendment. (VC, ¶¶ 120, 122; Ex. A, ¶¶ 78-79; *see* University of Wyoming Mission, attached to MPI as Ex. "L").  Schmidt was puzzled by and disagreed with the limitation, but wanting to avoid trouble, he took Langford's name off the sign as instructed while O'Neil watched to ensure compliance. (VC, ¶¶ 122-26; Ex. A, ¶¶ 80-82; Photograph of Schmidt's table sign after change to message, attached to MPI as Ex. "M").  Following the alteration to the message, O'Neal walked away, and Schmidt proceeded with his tabling without further incident. (VC, ¶ 127; Ex. A, ¶¶ 83-87).

A few days later, on the morning of December 5, 2022, UW President Ed Seidel sent out an email message to the UW community about the Schmidt incident and a couple of other unrelated matters.  (VC, ¶¶ 131-132; Ex. A, ¶ 88; Seidel's message, attached to MPI as Ex. "N"; *see Cowboy State Daily* article about message, attached to MPI as Ex. "O"; *Casper Star Tribune* article about message, attached to MPI as Ex. "P").  Seidel hinted at some "heated exchanges" in his message but said the university did not note any obvious violation of UW policies.  (VC, ¶ 133; Ex. N). Nor did Seidel indicate UW would restrict Schmidt's tabling privileges.  (VC, ¶ 133; Ex. N).  He acknowledged UW community members have diverse views and encouraged readers to call people into conversation.  (Ex. N).

Schmidt did not recall any "heated exchanges," only conversations. (VC, ¶¶ 137-138; Ex. A, ¶¶ 91-92).  But he agreed with the President's notion of making room for all perspectives and respecting each other's opinions.  (VC, ¶¶ 138-139; Ex. A, ¶¶ 92-93).  He was looking forward to

coming back and using a table at his next scheduled reservation set for December 9, 2022.  (VC, ¶¶ 127-130; Ex A, ¶ 87).

However, many individuals who oppose Schmidt's views were not pleased with the President's message or the action taken against Schmidt, believing UW had not done enough.  (VC, ¶ 140; Ex. A, ¶ 94).  Several UW students voiced frustration over UW's decision to let Schmidt stay in the UW Union and planned a public protest. (VC, ¶ 141).  The Associated Students of the University of Wyoming (ASUW) ridiculed Seidel's response as inadequate.  (VC, ¶ 142).  And, on December 7, 2022, a UW alumni group sent a letter bearing hundreds of signatures to Seidel, demanding UW Officials bar Schmidt from tabling in the UW Union, citing UW policy § 5.B.15 as basis.  (VC, ¶¶ 143-145; Letter from group of UW alumni, attached to MPI as Ex. "Q").  The signatories threatened to resign from alumni memberships, withhold donations, refuse to purchase UW merchandising, and abstain from attending UW-related events, unless UW Officials met their demands about Schmidt.  (Ex. Q).

On this same day, just a few hours after the UW alumni group issued their threat, O'Neil sent Schmidt a letter by email advising him that UW was banning him from having a UW breezeway table for one year. (VC, ¶ 147; Ex. A, ¶¶ 98-99; O'Neil letter to Schmidt, attached to MPI as Ex. "R").   O'Neil acknowledged Schmidt complied with her directive to remove Langford's name but elaborated that UW's Equal Opportunity Report and Response Officer concluded Schmidt violated UW Regulation 4-2 by committing discriminatory harassment against a current UW student, which prompted "corrective action."   (Ex. R; *see* UW Regulation 4-2, discrimination and harassment, attached to MPI as Ex. "S").  This report postulated that Schmidt's "trajectory" could lead to a hostile environment. (Ex. R; *see* Ex. S).  Akin to the UW alumni group,

O'Neil cited UW Union policy § 5.B.15 in support of the ban, emphasizing the following admonitions within it:

- "Language or actions that discriminate or harass the above groups [referencing student organizations, university departments, university organizations, outside entities] will not be tolerated."

- "All individuals tabling, whether UW affiliated or not, are expected to bring their views in a respectful and civil manner."

(VC, ¶ 150; Ex. R).  The letter also referenced how previous complaints led to loss of tabling, adding Schmidt had supposedly received "multiple verbal warnings" from UW representatives about his behavior.  (Ex. R).  In conjunction with this letter, Seidel sent out a second letter to the UW community advising of the table ban UW imposed on Schmidt. (VC, ¶¶ 154-157; Ex. A, ¶ 103; Seidel letter, attached to MPI as Ex. "T").

Schmidt was troubled by the ban, seeing no justifiable basis for it. (VC, ¶ 158; Ex. A, ¶ 104).  O'Neil specified two reasons in her letter for the suspension:  1) multiple complaints and 2) an undisclosed report concluding Schmidt had violated UW policy by engaging in "discriminatory harassment."  (VC, ¶ 159; *see* Ex. Q).  Schmidt is unaware of any student complaints or verbal warnings. (VC, ¶¶ 160-162; Ex. A, ¶¶ 105-107).  He does not how the message on his sign could constitute "discriminatory harassment."  (VC, ¶¶ 163-170; Ex. A, ¶ 108).

Several days later, on December 9, 2022, Wyoming Secretary of State elect and numerous state legislators wrote a letter to UW officials challenging the punishment Schmidt received for his message about Langford. (VC, ¶ 171; Ex. A, ¶ 109; Wyoming state officials' letter, attached to MPI as Ex. "U").  Among other requests, these individuals asked UW officials to honor the First Amendment rights of everyone, including individuals like Schmidt who object to the inclusion of biological males in sororities. (VC, ¶ 172; Ex. U).  Also, majority floor leader Chip Neiman sent separate correspondence to UW reminding them of their obligations under the First Amendment

to respect differing views.  (VC, ¶ 173; Ex. A, ¶ 110; Neiman letter, attached to MPI as Ex. "V"). However, UW refused to change its stance on Schmidt, as reflected in UW's response letter sent on December 14, 2022, authored by Mike Smith, Vice President for Governmental Affairs & Community Engagement.  (VC, ¶¶ 174-176; Ex. A, ¶¶ 111-112; Smith letter, attached to MPI as Ex. "W").

As it stands, UW enforces a table ban on Schmidt until the spring of 2024. (VC, ¶¶ 177-180; Ex. A, ¶¶ 113-115).  Additionally, UW maintains an ongoing prohibition on Schmidt's speech, keeping him from saying Langford is a male by other means on the campus, while Langford remains free to publicize the incident. (VC, ¶¶ 181-188; Ex. A, ¶¶ 116-125; *see* Langford poster, attached to MPI as Ex. "X"; UW student election results, attached to MPI as Ex. "Y"). Schmidt requires timely relief so he can regain table for fall semester this year and freedom to share his opinons.  (VC, ¶¶ 189-191).

## ARGUMENT

A preliminary injunction should be granted whenever the movant demonstrates "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest."  *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (citation omitted).  Schmidt meets these requisites.

## I.  SCHMIDT IS VERY LIKLELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

The government entity and its officials bear the burden of justifying a speech-restrictive policy throughout every aspect of litigation, including the preliminary injunction stage. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). If government defendants cannot establish the challenged rules and policies are constitutional during preliminary

injunction stage, the plaintiff "must be deemed likely to prevail" in his claims. *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666 (2004).

UW Officials cannot meet their burden here. The propriety of UW's policies is assessed through forum analysis, with the Court evaluating A) the constitutional protection afforded the speech and B) the forum type where the speech is sought, and, from a determination reached on these two inquires, C) apply the appropriate level of scrutiny to the speech restriction. *Cornelius vs. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1995). This assessment shows UW policies violate Schmidt's right to free speech. And because these policies fail to supply fair notice of prohibited conduct, chilling constitutional freedoms, they also violate Schmidt's right to due process. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

### A. Schmidt's Expression and Views are Constitutionally Protected

Schmidt wants to share his earnestly held religiously based belief about the sex of Artemis Langford to UW students through a sign attached to a breezeway table in the UW Union. No less than secular speech, religious speech (like Schmidt's) enjoys protection under the First Amendment to the United States Constitution. *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (plurality). The First Amendment further guards "conduct [that] possesses sufficient communicative elements" as well as "the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404, (1989). As tabling and signs are both expressive methods covered by the free speech clause, attempts to regulate these instrumentalities are closely scrutinized. *See Boos v. Barry*, 485 U.S. 312, 318 (1988) (protection afforded signs); *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 798 (9th Cir. 2006) (holding use of portable tables as means of disseminating messages protected by the First Amendment); *Int'l Caucus of Labor Comms. v. City of Montgomery*, 111 F.3d 1548 (11th Cir.1997) (per curiam) (holding policy banning use of tables

from a traditional public forum regulated expressive activity).  That some find Schmidt's message offensive does not place the content or methodology outside of constitutional covering.  *See Cox v. Louisiana*, 379 U.S. 536, 551-52 (1965) (constitutional protection does not hinge on how well the message is received).  Indeed, "a function of free speech …is to invite dispute[,] [perhaps] best serv[ing] its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

The "fighting words" exception is not applicable to Schmidt's message.  This doctrine is necessarily limited in scope because it is inconsistent with free speech principles.  *Johnson*, 491 U.S. at 408-09.  Arousing people to anger is not enough to turn protected speech into prohibited "fighting words." *Cannon v. City and County of Denver*, 998 F.2d 867, 873 (10th Cir. 1993).  For this narrow exception to apply, the offending comments must be directed to the person of the hearer, *Cantwell v. Connecticut*, 310 U.S. 296, 309-11 (1940), and reasonably regarded as a "direct personal insult." *Cohen v. California*, 403 U.S. 15, 20 (1971).  The remarks should also be of the sort that are inherently likely to provoke an "immediate violent reaction." *Id*.  And finally, of particular importance here, the alleged "fighting words" can play no role in the expression of ideas. *Feiner v. New York*, 340 U.S. 315, 319-21 (1951).  *See Cannon*, 998 F.2d at 873 (recognizing these Supreme Court guidelines for determining the existence of "fighting words").

Thus, Schmidt's message about Langford's sex does not qualify as "fighting words" for several reasons.  Even assuming a reference to one's biological status assigned at birth could qualify as an insult, Langford is the only person who could consider the message personal and Schmidt did not direct the message toward Langford.  And while some individuals expressed concerns about Schmidt's message, it did not prompt a violent reaction, but discussion.  Also, the

purpose of Schmidt's message is to offer his religious views on a well-known topic for which Langford had already generated a significant amount of publicity.

Schmidt's message about Langford deserves First Amendment protection.  It matters not that UW representatives or some students disagree with his beliefs, find his statement offensive, or even disturbing.  For "if absolute assurance of tranquility is required, we may as well forget about free speech." *City of Houston v. Hill*, 482 U.S. 451, 462 n. 11 (1987) (citation omitted).

### B.  Union Breezeway Table is a Designated Public Forum for Free Expression

The propriety of a restriction on protected speech turns on the place where the speech is sought. *Frisby v. Schultz*, 487 U.S. 474, 479 (1988); *Verlo* 820 F.3d at 1129.  Schmidt would like to share messages from a sign at a breezeway table in the Union, a venue UW makes available to a large variety of groups, including nonprofits like Schmidt.

The Tenth Circuit recognizes four types of fora for speech purposes: traditional public fora, designated public fora, limited public fora, and nonpublic fora.  *Doe v. City of Albuquerque*, 667 F.3d 1111, 1128 (10th Cir. 2012).  The breezeway tables in the UW Union classify as designated public fora.

A designated public forum is property the government has intentionally opened for public discourse.  *Summum v. Callaghan*, 130 F.3d 906, 914 (10th Cir. 1997).  Access is granted by design. *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999).  Examples include university meeting facilities, school board meetings, advertising space in subway and commuter rail stations, senior center sponsoring lectures, and public libraries.  *Id.* at 1287.  "A designated public forum may be created for a limited purpose for use by certain speakers, or for discussion of certain subjects." *Callaghan*, 130 F.3d at 914 (quotation marks and citation omitted). *See Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1278 (10th Cir. 1996) (designation

public forum can be limited by participants or subject matter). The difference between a designated public forum for a limited purpose and a limited public forum is not always clear, but the distinction must be discerned and acknowledged. *Callaghan*, 130 F.3d at 916 n. 14. Designated and limited "are not interchangeable terms." *Id.* A designated public forum is treated like a traditional public forum, prone to the same standards. *Callaghan*, 130 F.3d at 914. *See Verlo*, 820 F.3d at 1134 n. 8 (restrictions in designated public fora are subject to same scrutiny as traditional public fora).

To determine the existence of a designated public forum, a court evaluates the purpose, use, and intentions for the forum. *Callaghan* 130 F.3d at 915 n. 13 (delineating factors for finding designated public fora). *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012) (employing *Callaghan* factors to assess designated public fora). Each factor weighs in favor of designated public forum status in this case. The unquestioned purpose behind UW Union breezeway tables is to facilitate communication from assorted voices: student organizations, university departments and organizations, sponsored outside groups, along with non-sponsored merchants, vendors, and nonprofit groups. UW's use of breezeway tables likewise establishes designated public forum status. This requirement is satisfied if the access is something more than selective, whenever the government entity allows the public, or a certain class of speakers, or certain subjects general access to the forum in question. *Callaghan*, 130 F.3d at 915 n. 13. *See Doe*, 667 F.3d at 1129 (limitation on First Amendment activities does not alter the designated public fora status.as long as the government permits general access to the forum, whether by the general public, certain speakers, or for certain subjects). UW's process reveals this kind of generalized access. While the use of a table is subject to a few conditions, like requiring persons to remain with their tables, anyone falling within the large swath of permissible groups can reserve

a breezeway table.  And finally, government intention confirms the designated public forum status. This is demonstrated by the tabling process itself, with UW supplying tables in the Union for communicative reasons.   Facilitating speech on a public university campus reflects an intention to create a designated public forum.  *Callaghan*, 130 F.3d at 914.  *See Mason v. Wolf*, 356 F.Supp.2d 1147 (D. Col. 2005) (area around flagpole on university campus deemed designated public forum).  And particularly, setting aside tables for speech in a university student center evinces designated public fora.  *See Hershey v. Turner*, No. CIV-19-344-SPS, 2020 WL 1932911 (E.D. Ok. April 21, 2020) (recognized tables in university center as designated public fora).

### C.  UW Commits Viewpoint Discrimination with the Censorship on Schmidt's Speech

UW Officials prohibit Schmidt from saying "Artemis Langford is a male" because the remark is supposedly contrary to the university mission.  While Schmidt is free to say "Artemis Langford is a female," referencing UW's preferred designation for Langford, he is precluded from expressing his personal belief about Langford's sex.   This disparate approach to opposing viewpoints on the same subject matter crosses a constitutional line.  Government officials violate the First Amendment when they "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion…." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  UW Officials determined Schmidt's view on Langford's sex is not orthodox and censored it for this reason.  They committed viewpoint discrimination with the censorship.

Viewpoint discrimination occurs when government officials regulate speech due to the point of view expressed.  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  It is an egregious form of content discrimination, focusing on the "particular views taken by speakers on a subject." *Id.*  UW Officials committed such viewpoint discrimination against Schmidt by requiring him to take back his opinion about Langford's sex.  "It is axiomatic that the

14

government may not regulate speech based on its substantive content or the message it conveys." *Id.* at 828. For when it does so, the action is presumed unconstitutional. *Id.* A government entity could not exclude disfavored views even if the speech is unprotected. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381-96 (1992). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or the perspective of the speaker is the rational for the restriction." *Rosenberger*, 515 U.S. at 829.

Hence, UW Officials are not at liberty to suppress Schmidt's views on Langford's sex. He should be free to say Artemis Langford is a male sans restraint. *Accord Merriweather v. Hartop*, 992 F.3d 492, 509-12 (6th Cir. 2021) (taking allegations as true, holding university violated college professor's First Amendment rights by dictating how he had to refer to a student's sexual identity).

### D.  UW's Table Ban is Not a Reasonable Time, Place Manner Restriction

In addition to censoring Schmidt's viewpoint about Langford's sex, UW Officials have punished Schmidt for expressing this viewpoint, barring his access to a breezeway table in the UW Union for an entire year. This ban is likewise unconstitutional.

To survive constitutional scrutiny, a restriction on speech in a designated public forum must "be content-neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). *See Eagon Through Eagon v. City of Elk City, Okl.*, 72 F.3d 1480, 1487 (10th Cir. 1996) (recognizing these factors). If a rule is content based, it is subject to strict scrutiny, meaning the government entity "must show that its [restriction] is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* UW Officials cannot overcome this standard.

### 1.  Table ban is premised on Schmidt's content and viewpoint

As discussed above, restrictions that target individual viewpoints - like Schmidt's - are constitutionally invalid. *Rosenberger*, 515 U.S. at 828. Content-based regulations are similarly disfavored and presumptively unconstitutional. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). A law or regulation is considered content-based if it draws a distinction between speakers because of the content of their speech. *Id.* This understanding includes regulations that assess the "function or purpose" of the speech and treat it differently. *Id.* Any evaluation that contemplates content is an "obvious content-based inquiry." *Reed*, 576 U.S. at 170. And if a law is facially content-based, no content-neutral justification can save it. *Id.* at 163.

Citing § 5.B.15 as grounds for shutting down Schmidt's tabling expression, UW Officials rely on two statements within it:

- "Language or actions that discriminate or harass the above groups [referencing student organizations, university departments, university organizations, outside entities] will not be tolerated."

- "All individuals tabling, whether UW affiliated or not, are expected to bring their views in a respectful and civil manner."

These statements implicate content. The first refuses to "tolerate[]" any "language …that discriminate[s] or harass[es]…." Thus, punitive measures are tied to the function of the language used, whatever words UW believes will discriminate or harass others. The second statement operates similarly, premising the table venue on speaker expressing "views" in a way UW considers "a respectful and civil manner." If the verbiage from the table does not match up to UW's aspirations, consequences, including expulsion from table speech, will result. These restrictions are unavoidably linked to content as well as viewpoint.

Moreover, UW specified prior complaints about Schmidt's expressive activity as one of the reasons for invoking § 5.B.15 against him. This basis equates to a heckler' veto, allowing students who disagree with Schmidt's opinion to eliminate his speech altogether by complaining

about it.  *See Reno v. ACLU*, 521 U.S. 844, 880 (1997) (government policy that enables an offending party to censor speech is an invalid heckler's veto).  "Listener's reaction to speech is not a content-neutral basis for regulation."  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134-45 (1992).  The Supreme Court has "squarely rejected" a "heckler's veto" as a means for dealing with speech consider offensive.  *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989).  It is never proper for the government to suppress one side of a debate.  *Rosenberger*, 515 U.S. at 829.

### 2.  Table ban is not narrowly tailored to serve a significant government interest

Narrow tailoring requires an imposition on speech not "burden substantially more speech than is necessary to further the government's legitimate interests."  *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).  In other words, a valid restriction can eliminate no more than "the exact source of evil that it seeks to remedy."  *Frisby*, 487 U.S. at 485 (internal quotation marks omitted).  The one-year ban UW Officials impose on Schmidt's table use goes far beyond the requisite scope.  A significant disconnect exists between UW's stated interests and the one-year table ban.

Several of the interests UW Officials proffer for the year-long table ban are illegitimate in the first place.  Any interest the university has in facilitating a heckler's veto is patently invalid.  *See Bible Believer v. Wayne Cty.*, 805 F.3d 228, 248 (6th Cir. 2015) (*en banc*) (heckler's veto amounts to viewpoint discrimination).  Neither is UW's stated interest in keeping viewpoints "respectful and civil" an appropriate reason for curbing free speech.  For "it is the minority view, including expressive behavior that is deemed distasteful and highly offensive to the vast majority of people, that most often needs protection under the First Amendment."  *Id*. at 243.  The only interest UW Officials mention that is conceivably legitimate is to prevent students from suffering from discriminatory harassment.  And with this interest, the overarching ban on Schmidt's table use is not narrowly tailored way to serve it.

The narrow tailoring inquiry delves into "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned*, 408 U.S. at 106. The government bears this burden. *See Clark v. Community For Creative Non-Violence*, 468 U.S. 288, 293 n. 5 (1984) ("[I]t is common to place the burden upon the Government to justify impingements on First Amendment interests"). And UW cannot withstand its weight.

Total bans on protected mediums of expression - like this one on tables - are inherently suspect. *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994). The Supreme Court has repeatedly "voiced particular concern with laws that foreclose an entire medium of expression [because] by eliminating a common means of speaking, such measures can suppress too much speech." *Id. See, e.g., Gerritsen v. City of Los Angeles*, 994 F.2d 570, 573-74 (9th Cir. 1993) (invalidating ban on literature distribution in parts of public park). Tabling, in and of itself, does not lead to any appreciable injury or disruption, especially in an area designated for free speech. *See Saia v. New York*, 334 U.S. 558, 562 (1948) (invalidating restriction on amplification without regard to volume). *See also Deegan v. City of Ithaca*, 444 F.3d 135, 144 (2d Cir. 2006) (holding oral preaching that can be heard 25 feet away compatible with a public area). The total ban, particularly, as a form of punishment, is unjustifiable.

UW Officials rely on an overly broad interpretation of "discriminatory harassment" for its table ban, which application engulfs too much protected speech within the proscription. The message did not create a hostile environment, affect Langford's academic standing, educational benefits, or create any harm to Langford in any meaningful way. Langford did not suffer in any harm from Schmidt's sign. Though UW Officials interpret discriminatory harassment to mean an expression of views a student might find offensive, a true finding of discriminatory harassment requires much more. Schmidt's reference to Langford's biological status does not suffice. *See*

*Merriweather*, 992 F.3d at 511 (holding college professor's refusal to use preferred pronouns did not deny educational benefits of student).  The table ban is thus not narrowly tailored to meet a significant government interest.

### 3.   Table ban does not leave ample alternatives for Schmidt's message

Apart from content-neutrality and narrowly tailoring requirements, a valid speech restriction in a public forum should also leave open ample alternative channels of communication for the speaker's message.  *Perry*, 460 U.S. at 45; *see iMatter Utah v. Njord*, 774 F.3d 1258, 1267 (10th Cir. 2014) (intermediate scrutiny requirements are conjunctive).  This requirement ensures a speaker has adequate opportunity to gain his audience's attention and convey his intended message to them.  *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) (First Amendment protects opportunity to win attention of audience); *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 866 (9th Cir. 2001) (alternatives are ample only if the speaker's intended message can reach his audience).

That Schmidt can speak on parts of the campus outside the Union is of little consequence. Mere availability of some kind of alternative does not make it a viable one. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002).  Public speaking outside the Union is very different from tabling inside the Union, involving different forms of speech and different audiences.  *See Mahoney v. Babbitt*, 105 F.3d 1452, 1459 (D.C. Cir. 1997) (explaining "it cannot rightly be said that all [] forums are equal.").  *See also Amnesty Int'l, USA v. Battle*, 559 F.3d 1170 (11th Cir. 2009) (holding separating speakers from audience by 50 to 75 yards failed to leave ample alternatives); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (holding leafletting and demonstrations at entrance of pier were not ample alternatives because their audience was inaccessible from that location).

Schmidt desires to speak in a conversational tone.  He wants to speak with materials facilitated by tabling.  And he would like access to the particular pedestrian traffic that the UW Union breezeway affords.  Keeping Schmidt from all this expressive activity through its ban on his tabling, UW Officials deny him viable alternatives for his speech.

**E.  UW's Policies Violate Due Process**

The Due Process clause of the Fourteenth Amendment requires laws, rules, and policies give citizens of ordinary intelligence "fair notice" their behavior could pose risk of sanction. *Grayned*, 408 U.S. at 108-09.  Restrictions that are uncertain or vague allow enforcing officials to have undue discretion in their decision-making, invariably leading to arbitrary and discriminatory decisions.  *Id.  See City of Lakewood v. Plain Dealer Pub'g Co.*, 486 U.S. 750, 760, 763-64 (1988) (noting how lack of explicit standards let officials discriminate on basis of viewpoint). The need for clarity in laws is especially great when restrictions affect expressive activity (as here) because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone" and chill protected speech.  *Grayned,* 408 U.S. at 109.  *See Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 499 (1982) (vagueness concerns are heightened when restriction covers expression). The vague language set out in § 2.B.4 and § 5.B.15, as well as the vague application of these two policies, violate Schmidt's right to due process.

With § 2.B.4, UW Officials can censor speech after granting the request upon finding the speech is contrary to UW's mission statement.  Notably, UW Officials did not inform Schmidt in advance that § 2.B.4 and UW's mission statement could be wielded to require his compliance through threat of arrest.  The language of § 2.B.4 indicates that it only affects reservations. Moreover, no university official ever explained to Schmidt how his message could be contrary to the university mission.  This deduction is far from self-evident.  UW's mission statement

predominantly speaks of the university's desire for accessible and quality education, communication and application of knowledge, community and economic development, and stewardship of resources. It also articulates that the university has a primary mission of learning, seeking opportunities that will produce successful graduate students, a community of learning, an environment that values and manifests diversity, internationalism, free expression, academic freedom, personal integrity, and mutual respect, and personal and physical growth. The mission further reminds UW is the state's only public university.

Therefore, UW's mission does not seemingly relate to Schmidt or his speech. And even if it was applicable, Schmidt did not violate it. Indeed, it was UW Officials who violated their own stated mission in their dealings with Schmidt. They failed to value Schmidt's "diversity" of thought or allow him to manifest his thought. They shut down his "free expression." UW Officials tried to compel him to forego his "personal integrity" and they utterly failed to show "mutual respect" for his beliefs and speech. The invocation of UW's mission statement to ban Schmidt's speech trampled his right to due process.

Similarly, UW's invocation of § 5.B.15 regarding regulation of breezeway tables neglected to provide Schmidt with fair notice of the risk of sanction. UW Officials claim Schmidt did not abide by a sentence in that provision stating language and actions that discriminate or harass select groups identified would not be tolerated. However, for reasons discussed herein, Schmidt had no reason to believe his sign would discriminate or harass Lanford or anyone else. And though UW Officials assert Langford was harassed, they do not explain how any purported harassment of Langford is relevant since he does not qualify as one of the groups identified in the sentence.

UW Officials highlight another sentence in § 5.B.15 stating individuals using tables, whether affiliated with UW or not, are expected to express views in a respectful and civil manner.

As discussed, Schmidt believed he was acting in a respectful and civil manner at all times with his speech.  He did not threaten Langford or address Langford with his message.  He did not call Langford a name or denigrate Langford's character. Rather, Schmidt offered an opinion on a public issue that Langford had made public.  Moreover, the sentence does not indicate any penalty for a failure to comply.

Further, UW Officials rely on another sentence stating "complaints" received about external community members will be warned once and subsequent complaints may result in loss of access to tabling.  This provision is also riddled with vague notions.  The sentence does not require the complaint about an external member be merited or verified, just that some unspecified complaint exists.  In any event, Schmidt is unaware of any complaints made to UW.  He never received a requisite warning.  UW Officials' use of this tenuous provision as basis for the one-year table ban also violates Schmidt's right to due process.

## II.  SCHMIDT IS CONTIUNUING TO INCUR IRREPARABLE HARM

UW Officials' censorship bars Schmidt from communicating his viewpoint about Langford's sex.  This censorship is ongoing and permanent in nature.  UW Officials also prohibit Schmidt from using a breezeway table in the Union for his speech purposes, though he had freedom to do so for 17 years prior to the prohibition.

Schmidt requires timely relief from both restrictions.  As of now, he is unable to share his message about Langford in any form on UW campus and unable to use breezeway table regardless of the message he would communicate.  The reality of these sanctions chill Schmidt's speech greatly, causing him to suffer irreparable harm.  The "loss of First Amendment freedoms…unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## III.  HARM TO SCHMIDT OUTWEIGHS ANY HARM TO UW OFFICIALS

UW officials would suffer no appreciable harm if this Court grants Schmidt's motion preliminary injunction, as this result would only require UW officials to refrain from violating constitutional rights.  They would remain free to enforce appropriate measures to protect legitimate interests.  When a law is likely unconstitutional, the government's interests do not outweigh a plaintiff's interest in the protection of his constitutional rights.  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013).

## IV.  PRELIMINARY INJUNCTION WOULD BEST SERVE THE PUBLIC INTEREST

The preliminary relief Schmidt seeks - to enjoin UW's unconstitutional policies - would protect free expression in public fora.  "Vindicating First Amendment freedoms is clearly in the public interest."  *Verlo*, 820 F.3d at 1127 (citation omitted).

## CONCLUSION

For the reasons set out herein, Schmidt respectfully requests this Court grant his Motion for Preliminary Injunction.

Respectfully submitted this 28th day of  June 2023.


Respectfully submitted,


*/s/ Nathan W. Kellum*                     */s/ Douglas J. Mason*
NATHAN W. KELLUM*                      DOUGLAS J. MASON
TN BAR #13482; MS BAR # 8813      Wyoming Bar #6-3400
Center for Religious Expression         Mason & Mason, P.C.
699 Oakleaf Office Lane, Suite 107    P.O. Box 785
Memphis, TN 38117                          Pinedale, WY 82941
(901) 684-5485 telephone                  307-367-2133
(901) 684-5499 – Fax                        dmason@masonlawpinedale.com
Email:  nkellum@crelaw.org
*Admitted Pro Hac Vice*

Attorneys for Plaintiff

23

## CERTIFICATE OF SERVICE

I hereby certify that on June 28th, 2023 the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, and that a copy of the foregoing will be delivered to a process server for service on defendants.

s/ Nathan W. Kellum

Attorney for Plaintiff
