NATHAN W. KELLUM
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN 38117
(901) 684-5485 telephone
(901) 684-5499 – Fax
nkellum@crelaw.org

DOUGLAS J. MASON
Wyoming Bar #6-3400
Mason & Mason, P.C.
P.O. Box 785
Pinedale, WY 82941
307-367-2133
dmason@masonlawpinedale.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

| | |
|---|---|
| **TODD SCHMIDT,**<br><br>Plaintiff,<br><br>v.<br><br>**EDWARD SEIDEL**, in his official capacity as the President of the University of Wyoming, and **RYAN O'NEIL,** individually and in her official capacity as Dean of Students for the University of Wyoming,<br><br>Defendants. | CIVIL ACTION NO.: 2:23-cv-00101-NDF<br><br>**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## INTRODUCTION

Plaintiff Todd Schmidt ("Schmidt) seeks preliminary injunctive relief from named defendants (referred to jointly as "UW Officials") in two distinctive respects: 1) from applying UW Union Policy § 2.B.4 or any other policy or practice to censor disfavored views, particularly, Schmidt's viewpoint on Artemis Langford's sex status; and 2) from applying UW Union Policy § 5.B.15 or any other policy or practice to bar or suspend Schmidt's access to a breezeway table in the UW Union due to him expressing his opinion about Artemis Langford's sex status. (Doc. 8; Doc. 9).

UW Officials characterize the injunction as "mandatory" (Doc. 15, p. 12), but they are only partially correct. An injunction on the policy barring Schmidt's viewpoint about Langford is not mandatory in nature, for it would not require officials to take any affirmative action but to refrain from prohibiting Schmidt's protected speech again. Also, the aspect of the requested injunction that seeks future relief for table use, *i.e.*, Schmidt's freedom to obtain a table in the future without fear of reprisal for expressing his beliefs, is not mandatory. The only part of the injunction that qualifies as mandatory is the request to lift the current, ongoing one-year table ban that UW imposes on Schmidt. But, in any event, even under a heightened standard, Schmidt is entitled to an injunction regarding both concerns. He meets each requisite for preliminary injunction for both concerns.[1]

## I.    LIKELY TO PREVAIL ON MERITS OF CONSTITUTIONAL CLAIMS

UW Officials make much of having the authority to regulate Schmidt's speech (or what they like to call conduct), but they miss the point. The issue is not whether UW Officials have authority to regulate as much as whether they have exercised their authority in a constitutional way. UW Officials fall short of this mandate. They initially barred Schmidt from expressing a constitutionally protected viewpoint and then later banished him from using a breezeway table for expressing this viewpoint (prior to them barring it). Both restrictions are constitutionally infirm.

### A.   Bar on Expressing Viewpoint is Unconstitutional

As Ryan O'Neil confirms in her letter to Schmidt, UW Officials invoked UW Union Policy § 2.B.4 to censor Schmidt from expressing his viewpoint that "Artemis Langford is a male." (Ex.

---

[1] UW Officials curiously state in their Response that "the only action that the University has taken is to suspend Plaintiff from reserving a table in the Wyoming Union breezeway until January 2024" (Doc. 15, p. 11), focusing on the table ban punishment they levied against Schmidt. They gloss over their initial action of censoring Schmidt's message, forcing him to alter the message on his sign under the threat of criminal sanction. Both restrictions are unconstitutional and both merit injunctive relief.

R to MPI). This section provides: "Requests may be denied for reasons which include, but may not be limited to, conflict with the mission of the University, conflict with the mission of the Wyoming Union, unfeasible setup/turnaround time, and historic negligence or abuse." (Ex. B. to MPI). When O'Neil pointed this policy out to Schmidt, she did not accuse him of historic negligence or abuse, nor did she have a basis for doing so. Rather, she specifically claimed he violated the mission of the university as the basis for gagging his message. (Ex. A to MPI, ¶¶ 66-74). This censorship violates Schmidt's rights to free speech and due process.

### 1. Violates Schmidt's right to free speech

Prohibiting Schmidt from saying "Artemis Langford is a male" is a clear restriction on viewpoint. UW Officials do not quarrel with this understanding. Instead, they claim Schmidt's speech is not really speech, but conduct, due to their belief that his expressed viewpoint amounts to "discrimination and harassment" under UW Regulation 4-2.

No doubt Schmidt's messaging on a sign qualifies as speech. Speech is found anytime "[a]n intent to convey a particularized message was present and … the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Only a few kinds of speech have constitutionally proscribable content, such as obscenity, defamation, and fighting words. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). And presently there is no "discrimination and harassment" exception to the First Amendment, particularly, as defined by UW to include "unwelcome" speech. (Ex. S to MPI). Moreover, viewpoint discrimination is inappropriate in any circumstance, even if the speech contains proscribable content. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383-84 (1992).

Against this backdrop of controlling precedent, UW Officials cite no cases suggesting a different conclusion. Rather, they question the usefulness of Title VII and Title IX if Schmidt is

allowed to speak freely. The analogy is inapt. These laws do not purport to regulate speech. And even assuming some modicum of expression exists with employment and sports decisions, Schmidt, as a permittee of space with no affiliation with UW, does not fall under the strictures of either legislation. The cases cited by UW Officials concern responsibilities of the employer or school. And the "fact sheet" from the U.S. Department of Justice and U.S. Department of Education – which by no means is a legal authority – references the actions of school employers and employees, not individuals unaffiliated with schools, creating a hostile environment.

Honoring the meaning of the free speech clause is not an "overly simplistic" notion. (Doc. 15, p. 17 n. 14). The hallmark of the First Amendment is to allow for free trade in ideas, which can include messages that a "vast majority of [] citizens believes to be false and fraught with evil consequence*." Virginia v. Black*, 538 U.S. 343, 358 (2003) (citation omitted).

### 2. Violates Schmidt's right to due process

Section 2.B.4, the policy O'Neil cited for censoring Schmidt's message under the threat of arrest, fails to provide adequate notice of criminal sanction. This omission violates due process. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). To which, UW Officials offer no rebuttal.

### B. Ban on Breezeway Table Use is Unconstitutional

In O'Neil's letter to Schmidt, she claims UW suspended Schmidt's breezeway table use because of previous complaints under § 5.B.15 and the report that his table sign was discrimination and harassment. (Ex. R to MPI).

The complaints that O'Neil references are either unrelated or unsubstantiated. O'Neil states that she orally warned Schmidt an unspecified number of times prior to 2021 about leaving his table and supposedly confronting students. But she does not elaborate on whether any of these

"confrontati[ons]" were anything but attempts to initiate friendly discussions. (Ex. A to Response). These instances are neither documented nor described. O'Neil also brings up a few complaints she received since 2021, which were documented, but notably, were not serious enough to prompt O'Neil to warn Schmidt about his activity. (Ex. A to Response). And UW Officials draw no connection with these "complaints" to § 5.B.15.

UW punishes Schmidt for expressing disfavored (or unwelcomed) views, most prominent being his table sign stating Artemis Langford is a male, taking a restrictive action on expression that violates Schmidt's right to free speech. And because this so-called "corrective action" has little relation to UW's stated policies, the table ban also violates his right to due process.

### 1. Violates Schmidt's right to free speech

UW Officials portray the Union breezeway tables as limited public fora, a characterization that does not jibe with Tenth Circuit case law. *E.g., Doe v. City of Albuquerque*, 667 F.3d 1111, 1128-29 (10th Cir. 2012). They stress the breezeway tables are limited to certain users and certain topics; however, it is well settled in this circuit that "[a] designated public forum may be created for a limited purpose for use by certain speakers, or for the discussion of certain subjects." *Summum v. Callaghan*, 130 F.3d 906, 914 (10th Cir. 1997). *See Doe*, 667 F.3d at 1129 (holding limitations on First Amendment activity does not preclude library from qualifying as designated public forum).

As shown in the initial memorandum, the *Callaghan* factors buttress this conclusion. (MPI Memo., p. 13). The purpose behind the breezeway tables is to facilitate communication from diverse sources. UW Officials reference UW Regulation 11-7 – a regulation never mentioned in dishing out the punishment - regarding the purpose of the Union, but nothing within this regulation contradicts this communicative purpose of the breezeway tables. Additionally, the use factor for

5

designated public fora is satisfied by the use of certain speakers. And contrary to UW Officials' suggestion, the permitting process does not establish the breezeway tables as limited public fora. The intent factor is met when the government opens up a forum for discourse. *Summum*, 130 F.3d at 906 n. 13.

Besides, viewpoint restrictions are invalid in limited public fora just as they are in designated public fora. *Summum*, 130 F.3d at 916. UW Officials' attempt to avoid this conclusion is unavailing. They prop up UW Regulations 4-2 and 11-7 as being viewpoint neutral on their face. Yet UW relied on UW Union Policy § 5.B.15 in issuing the table ban on Schmidt, which explicitly eliminates certain "language" and "views" that are not to the liking of the university. (Ex. B to MPI). And regardless of the reasoning behind the restriction, the stubborn fact is the restriction itself is based on viewpoint. While UW disallows the statement that Artemis Langford is a male, it wholeheartedly approves the sentiment that Artemis Langford is female. The undeniable difference between the two is viewpoint. Depicting the speech as an "act" does not circumvent the reality of the viewpoint discrimination at hand.

### 2. Violates Schmidt's right to due process

As previously explained, the invocation of UW Union Policy § 5.B.15 to ban Schmidt from using a breezeway table is unconstitutionally vague and violates due process. (MPI Memo, pp. 21-22). UW Officials do not bother to defend the language of this policy, they ignore it, again, diverting attention to UW Regulation 4-2 and its prohibition on "discrimination and harassment," which they claim was the underlying basis for the action taken.

Even accepting as true, UW Officials are still responsible for the policy they specifically invoked for the table ban, § 5.B.15. Additionally, UW Regulation 4-2 further contravenes due process because it similarly fails to supply adequate notice of sanction. In the letter, O'Neil

concedes that Schmidt's expressive activity does not generate a hostile environment. (Ex. R. to MPI). Neither does Schmidt's statement about Langford amount to "discrimination" or "harassment" as defined by the regulation itself. A finding of "discrimination" requires a complainant individual experience an "adverse consequence" like a "fail[ure] to be hired or promoted or denial of admission to an academic program," which is missing here.[2] Similarly, "harassment" requires "[v]erbal or physical conduct that unreasonably interferes with an individual's work or academic performance or creates a hostile work or educational environment." Nothing in the record implies that Langford suffered in work or academics as a result of Schmidt's sign. The application of UW Regulation 4-2 (to the extent it was applied), as with UW Union Policy § 5.B.15, violates Schmidt's right to due process.

## II.   BALANCE OF HARMS GREATLTY FAVOR PRELIMINARY INJUNCTION

Schmidt is presently and continually suffering harm in two significant ways: 1) UW prohibits him from communicating his viewpoint about Artemis Langford's sex status - though the topic is a contested and public issue - by any conceivable means on the UW campus; and 2) UW bars his use of a breezeway table for one year no matter what Schmidt would communicate at the table. As shown, both restrictions infringe on his constitutional rights, patently demonstrating two-fold irreparable harm. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

UW Officials seek to minimize Schmidt's harm by minimizing the effect of him losing constitutional rights. As for the table suspension, UW Officials posit that he can speak elsewhere, but they are not at liberty to ban expression in "appropriate places [] on the plea that it may be

---

[2] For that matter, there is no indication that Langford complained or saw the sign.

exercised in some other place." *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939). To be sure, "it cannot rightly said that all [] forums are equal." *Mahoney v. Babbitt*, 105 F.3d 1452, 1459 (D.C. Cir. 1997). Schmidt's undisputed testimony is that no other venue can replace the unique communicative opportunities afforded by the breezeway table. (Ex. A, ¶¶ 11, 15-27).

UW Officials also argue in vain that Schmidt's supposed delay in bringing his claim undermines his need for relief. Delay is but one factor in the irreparable harm analysis. *Roda Drilling Co v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009). And no alleged delay can overcome the irreparable harm that accompanies a constitutional violation. *Verlo*, 820 F.3d at 1126. Also, perhaps, most cogently, Schmidt did not delay in pursuing his claim. Not having an adequate time to gather information and prepare necessary pleadings to obtain meaningful relief for the 2023 spring semester, he brought his claim to obtain relief at next available time, the 2023 fall semester.

In way of comparison, granting the preliminary injunction would pose no real harm to UW Officials. They remain free to comply with the university's Title VII and Title IX requirements, which have no connection to Schmidt's speech. But UW Officials have no legitimate interest in banning protected speech in public fora. When policies are likely unconstitutional (like those here), the government's interest in its policies cannot outweigh a plaintiff's interest in the protection of his constitutional rights. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013).

### III.  PUBLIC INTEREST GREATLY FAVORS PRELIMINARY INJUNCTION

"Vindicating First Amendment freedoms is clearly in the public interest." *Verlo*, 820 F.3d at 1127 (citation omitted). Schmidt's requested injunction serves the best interest of the public, protecting the fundamental right to free speech.

As with the other preliminary injunction factors, UW Officials diminish the import of First Amendment freedoms with this factor despite Tenth Circuit precedent on the issue. They contend Schmidt's very presence would be disruptive and generate safety concerns should he be allowed to come back to a table before this suspension ends. This is a *non sequitur* argument. UW's one-year suspension contemplates an eventual return. UW Officials fail to explain how Schmidt's presence would be any more unsafe this fall than it would next year after the suspension is over.

UW Officials also declare a "strong public interest" in shielding students and employees from "acts of discrimination and harassment." (Doc. 15, pp. 24-25). But this contention just begs the question: Can protected speech on a public issue in a public forum be suppressed by labeling the viewpoint as discrimination and harassment? "In the First Amendment context, the likelihood of success on the merits will often be the determinative factor because of the seminal importance of the interests at stake." *Verlo,* 820 F.3d at 1126 (citation and internal quotation marks omitted). Since Schmidt is likely to prevail on his constitutional claims, he meets this and other factors for a preliminary injunction.

## **CONCLUSION**

For the reasons set out in this Reply and in his initial memorandum, Schmidt asks this Court grant his motion for preliminary injunction.

Respectfully submitted this 31st day of July 2023.

Respectfully submitted,

| | |
|---|---|
| */s/ Nathan W. Kellum* | */s/ Douglas J. Mason* |
| NATHAN W. KELLUM* | DOUGLAS J. MASON |
| TN BAR #13482; MS BAR # 8813 | Wyoming Bar #6-3400 |
| Center for Religious Expression | Mason & Mason, P.C. |
| 699 Oakleaf Office Lane, Suite 107 | P.O. Box 785 |
| Memphis, TN 38117 | Pinedale, WY 82941 |
| (901) 684-5485 telephone | 307-367-2133 |
| (901) 684-5499 – Fax | dmason@masonlawpinedale.com |
| Email:  nkellum@crelaw.org | |
| **Admitted Pro Hac Vice* | |

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Reply in Support of Plaintiff's Motion for Preliminary Injunction was filed with the Clerk of Court using the CM/ECF system, sending notification to all counsel of record, this the 31st day of July.

s/ Nathan W. Kellum<br>
Nathan W. Kellum