

**FILED**

8:10 am, 8/18/23

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

TODD SCHMIDT,

       Plaintiff,

vs.

EDWARD SIEDEL, in his official
capacity as the President of the University
of Wyoming, and RYAN O'NEIL,
individually and in her official capacity as
Dean of Students for the University of
Wyoming,

       Defendants.

Case No.  2:23-cv-00101-NDF

---

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

This matter is before the Court on a Motion for a Preliminary Injunction filed by

Plaintiff Todd Schmidt ("Schmidt") against Defendants Edward Seidel ("Seidel"), in his

official capacity as the President of University of Wyoming ("UW"), and Ryan O'Neil

("O'Neil"), individually, and in her official capacity as Dean of Students for UW

(collectively, "UW Officials"). For the following reasons, the Court grants the Motion for

Preliminary Injunction.

### <u>Background</u>

Schmidt is an elder at the Laramie Faith Community Church. ECF 9. He frequently

visits the UW campus to share his beliefs with UW college students on various social and

political issues from his religious perspective. ECF 9. He has reserved a table in the UW Union breezeway on a regular basis for the past 17 years. ECF 9. The UW Union allows campus groups and various outside organizations to utilize breezeway tables to communicate with students. *Id*. The breezeway tables provide access to a high degree of student pedestrian traffic. Schmidt uses his breezeway table to display various DVDs and books. He also places on his table a Velcro-backed sign with plastic lettering to display different messages. *Id*.

According to UW Officials, they have over the years warned Schmidt to stay behind his breezeway table[1] and not engage in a confrontational manner towards passersby. ECF 15. The University alleges it has received and documented complaints from students that Schmidt "got in people's faces" while trying to talk to them and chased after students who refused to speak with him. *Id*. Schmidt states that he was not aware of any student complaints to University staff about him and received no warning from the University regarding student complaints. ECF 8, p. 17.

In September of 2022, a UW student named Artemis Langford joined a UW sorority. Langford was born a biological male but identifies as female. In October, the UW university newspaper, the *Branding Iron*, ran a story about Langford joining the sorority, and included quotes from Langford. Other publications, including the *Cowboy State Daily*,

---

[1] "Persons responsible for their tables must remain behind their respective tables and in no way hinder the flow of traffic through the building." *Wyoming Union Policies and Operating Procedures FY 2023*, Art II, Sec. 5.B.8, https://www.uwyo.edu/csil/student-orgs/_files/approved-union-policy-spring-2022.pdf (last visited August 7, 2023).

*Washington Examiner*, and *National Review*, ran articles about Langford as the first openly transgender student in UW history to join a sorority. ECF 8.

Schmidt disagrees with the propriety of transgender students joining sororities, and on December 2, 2022, he placed a sign at his breezeway table in the Union stating, "God created male and female and Artemis Langford is a male." ECF 9. Various students gathered in front of his table in an attempt to block others, and Langford,[2] from seeing Schmidt's sign. These students engaged in tense debate with Schmidt. UW Dean of Students Ryan O'Neil asked Schmidt to remove Langford's name from his sign because it violated Article II Section 2.B.4 of the UW Union policies,[3] and because it targeted an individual University student in a protected class. ECF 15, p. 37. Schmidt initially refused to remove Langford's name; however after O'Neil responded that she would call University Police, he agreed to remove Langford's name. ECF 9, p.6. O'Neil left and Schmidt continued to speak with students from his table. *Id*.

On December 5, 2022, UW President Edward Seidel sent out an email message to the UW community regarding the tabling incident. He stated that Schmidt had removed Langford's name from his sign when asked and that "while [Schmidt] engaged in heated exchanges with students and perhaps others throughout the afternoon, these interactions, were not in obvious violation of UW policies." ECF 8, p.121. Seidel went on to encourage

---

[2] Artemis Langford is both a UW student and an employee in the Wyoming Union. ECF 15.
[3] "Requests [for table space at the WY Union] may be denied for reasons which include, but may not be limited to, conflict with the mission of the University, conflict with the mission of the Wyoming Union, unfeasible setup/turnaround time, and historic negligence or abuse." *Wyoming Union Policies and Operating Procedures FY 2023*, Art II, Sec. 2.B.4, https://www.uwyo.edu/csil/student-orgs/_files/approved-union-policy-spring-2022.pdf (last visited August 7, 2023).

community members to "engage regarding those with different perspectives with respect and integrity." *Id*.

Various student groups felt disappointed with Seidel's response and on December 7, 2022, a UW alumni group sent a letter to Seidel disagreeing with his statement that Schmidt had not broken any UW policies. ECF 8, p. 134. The letter recounted prior incidents in which Schmidt had allegedly yelled at and harassed students regarding their sexual identities. The letter asked Seidel to ban Schmidt from tabling in the UW Union. They stated that if he did not do so they would resign from alumni memberships, withhold donations to the University, and refuse to return to campus for future activities.

Later that day, Dean O'Neil sent Schmidt a letter suspending his ability to reserve a table in the UW breezeway until Spring 2024. ECF 8 p. 182. She also reminded him to adhere to University policies or risk trespassing. *Id.* She based this decision on a December 7th report from the University's Equal Opportunity Report and Response Office[4] which stated that Schmidt had violated UW Regulation 4-2 (Discrimination and Harassment)[5] and noted that his behavior was "on a trajectory which, if continued, is likely to also create a hostile environment." *Id*. Dean O'Neil also cited the Wyoming Union Policies and

---

[4] The University stated that this office received at least 19 reports categorizing Schmidt's conduct that day as "discriminatory, harassing, and/or threatening." ECF 15, p. 9.

[5] UW Regulation 4-2 defines those terms:

> Discrimination: Occurs when an individual suffers an adverse consequence on the basis of the individual's Protected Class, including but not limited to failure to be hired or promoted or denial of admission to an academic program.
> Harassment: Verbal or physical conduct that unreasonably interferes with an individual's work or academic performance or creates an intimidating or hostile work or educational environment. This definition encompasses specific conduct and behaviors defined in UW Regulation 4-3 (Title IX and Sexual Misconduct).

*University of Wyoming Regulations 4-2*, https://www.uwyo.edu/regs-policies/_files/docs/regulations-july-2018/uw_reg_4-2_effective_7-1-18.pdf (last visited August 7, 2023).

Operating Procedures Article II Section 5.B.15[6] which prohibits discrimination or harassment and requires individuals tabling in the Union to bring views in a respectful and civil manner. *Id.* Lastly, she referenced prior multiple verbal warnings to Schmidt for previous student complaints. Although Schmidt is unable to reserve a table in the breezeway until Spring 2024[7], he is not banned from campus, nor the Union building.

Schmidt filed a complaint alleging violations of the Free Speech Clause of the First Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and of his right to be free from unconstitutional conditions. ECF 1. Schmidt then filed a motion for a preliminary injunction seeking relief from application of any UW policy that would bar him from access to a breezeway table in the UW Union or prevent him from expressing his views about the sex status of Artemis Langford. ECF 8.

## **Preliminary Injunction Standard and Application**

To prevail on a motion for a preliminary injunction the movant must demonstrate: "(1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party;

---

[6] "The union breezeway tabling will be maintained as a safe and non-threatening environment for student organizations, university departments, university organizations, outside entities sponsored by one of the previous groups listed, local merchants, vendors, and/or non-profits. Language or actions that discriminate or harass the above groups will not be tolerated. Students are expected to recognize that respecting the dignity of every person is essential for creating and sustaining a flourishing University community. Students should act to discourage and challenge those whose actions may be harmful to and/or diminish the worth of others, in accordance with the Student Code of Conduct. All individuals tabling, whether UW affiliated or not, are expected to bring their views in a respectful and civil manner. a. Complaints received about students will be brought to the office of the Dean of Students as a potential Student Conduct. Complaints received about external community members will be warned once. Subsequent complaints may result in a loss of access to tabling." *Wyoming Union Policies and Operating Procedures FY 2023*, Art II, Sec. 5.B.15, https://www.uwyo.edu/csil/student-orgs/_files/approved-union-policy-spring-2022.pdf (last visited August 7, 2023).
[7] UW's 2024 Spring Semester begins on January 16, 2024.

and (4) an injunction is in the public interest." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd* 573 U.S. 682 (2014). In First Amendment[8] cases, the first factor, likelihood of success on the merits, will often be the determinate factor. *Id*. at 1145. This is because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.). Further, when a law is unconstitutional, the interest of the government does not outweigh a plaintiff's interests in its constitutional rights. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Lastly, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id*. at 1132.

Because Schmidt's requested relief would alter the *status quo* it is a disfavored type of preliminary injunction. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). Schmidt "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.*

1. <u>Schmidt's Likelihood of Success on the Merits</u>

Schmidt argues that his speech is not harassment, but constitutionally protected expression. The breezeway is a designated public forum and therefore because the University's censorship is based on Schmidt's content and viewpoint it fails strict scrutiny. Lastly, he argues that the University's policies violate the Due Process clause of the

---

[8] The First Amendment, as applied to state and local governments through the Fourteenth Amendment, provides that state actors "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999).

Fourteenth Amendment by failing to provide fair notice that his behavior could lead to a ban from reserving tables in the Union breezeway.

UW Officials counter that Schmidt's speech was discriminatory and harassing conduct targeted towards a member of a protected class and therefore not protected speech. In compliance with Title IX, the University must prohibit acts of discrimination against University students and employees based upon sexual orientation and gender identity. Even under a free speech analysis, the Union breezeway is a limited public forum and the University's non-discrimination policy is a reasonable viewpoint neutral restriction on Schmidt's speech.

The Supreme Court has a three-step process for analyzing restriction on private speech on government property. *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1138-39 (10th Cir. 2001) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985)). First, we ask if the speech is protected by the First Amendment. *Id*. Then we determine the type of forum. *Id.* Lastly, we assess if the justifications for exclusion from the forum satisfy the standard particular to that forum. *Id.* We conduct this inquiry "in light of the special characteristics of the school environment." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 685-86 (2010). Here, the parties' main point of contention is at step one—whether the speech is harassment or protected expression under the First Amendment. Therefore, we begin with an analysis of harassment and free speech law in the university context.

A. *Harassment or Speech Protected under the First Amendment?*

Discriminatory harassment at a university is primarily governed by Title VII of the Civil Rights Act of 1964[9] and Title IX of the Education Amendments of 1972.[10] "Hostile environment" harassment cases first originated in the workplace. To bring a Title VII action for sexual harassment in the workplace, the harassment must be "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). To determine if an environment is hostile the court examines the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

The Supreme Court extended these Title VII hostile environment cases to the Title IX context in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), holding that "a plaintiff must show harassment that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities." 526 U.S. 629, 631 (1999).

In *Bostock v. Clayton Cnty., Georgia*, the Supreme Court ruled that Title VII extended to situations in which "an employer . . . intentionally treats a person worse

---

[9] Title VII of the Civil Rights Act of 1964 states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

[10] Title IX of the Education Amendments of 1972 states that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).

because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex." 140 S. Ct. 1731, 1740 (2020).

These cases thus focus primarily on conduct, rather than pure speech. *See also R.A.V. v. City of St. Paul*, 505 U.S. 377, 389-90 (1992) ("Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.") "[N]on-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001). However, where "pure expression is involved, anti-discrimination law steers into the territory of the first amendment." *Id.* at 206 (cleaned up). "'Harassing' or discriminatory speech, although evil and offensive, may be used to communicate ideas or emotions that nevertheless implicate First Amendment protections." *Id.* at 209. There is no "categorical 'harassment exception' to the First Amendment's free speech clause." *Id.* at 204.

In navigating the line between whether speech is harassment or protected free speech, courts have also considered whether the speech concerns a matter of public concern and whether it targets a particular student. In *Meriweather v. Hartop*, a professor refused to use a student's preferred pronouns when addressing that student. 992 F.3d 492, 501 (6th Cir. 2021). The university's Title IX office issued a report stating that the professor's treatment of the student created a hostile environment in violation of the university's non-discrimination policies and the university placed a written warning in the professor's file. *Id.* at 501. The District Court found that the professor's use of

pronouns was unprotected by the First Amendment. *Meriwether v. Trustees of Shawnee State Univ.*, No. 1:18-CV-753, 2019 WL 4222598, at *15 (S.D. Ohio Sept. 5, 2019), *aff'd in part, vacated in part, rev'd in part sub nom. Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). The speech was not "inherently expressive", did not "advance an idea transcending personal interest", did not "convey any beliefs or state[e] any facts about gender identity", and did not take place in the context of a broader discussion. *Id.* at *15.

The Sixth Circuit disagreed, finding that "his mode of address *was* the message" and "advanced a viewpoint" on "gender identity—a hotly contested matter of public concern." *Meriwether*, 992 F.3d at 506, 508, 509 (emphasis in original); *see also Taking Offense v. State*, 66 Cal. App. 5th 696, 712 (2021) (striking down statute that criminalized misgendering patients by staff members of long-term care facilities, holding that misgendering conveyed an ideological message and that misgendering did not necessarily create a hostile environment). The Court went on to say that the professor's speech did not violate Title IX because it did not violate the *Davis* standard and did not inhibit the student's education or ability to succeed in the classroom. *Meriwether*, 992 F.3d at 511.

Similarly, in *Rodriguez v. Maricopa County Community College District* a court held that a professor's racially charged emails on a matter of public concern did not constitute unlawful workplace harassment in violation of Title VII. 605 F.3d 703, 710 (9th Cir. 2010). The court distinguished between "racial insults or sexual advances

directed at particular individuals in the workplace [which] may be prohibited on the basis of their non-expressive qualities . . . and pure speech." *Id.*

One recent court questioned whether the "severe and pervasive" hostile environment standard from *Davis* for Title IX liability applied to a school district's code of conduct prohibiting intentional misgendering and other harassing conduct. *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-CV-01595, 2023 WL 4848509, at *11 (S.D. Ohio July 28, 2023). The court questioned whether the same standard for when a school board can be held liable for failing to prevent student harassment should also dictate when a school may institute policies to restrict such harassment. *Id*. at 10. Instead, the court upheld the speech code under the principal that public schools may prohibit student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at *1 (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)).

Here, the facts do not demonstrate harassment under the *Davis* standard, *i.e.*, harassment so severe, pervasive, and objectively offense that it denies the victims' equal access to an institution's resources and opportunities. *Davis*, 526 U.S. at 631. Schmidt engaged in tense debate with students regarding the propriety of a biological male joining a sorority. He did not engage directly with Artemis Langford. His sign was pure speech and not conduct. Furthermore, Schmidt's speech does not meet the University's own definition of discrimination of harassment. *See supra* note 5. There is no evidence

11

Langford suffered any adverse consequences or experienced interference with academic or work performance.

Nor does Schmidt's speech meet the lesser *Tinker* standard of "substantial disruption" or "invasion of the rights of others." 393 U.S. at 506. The University puts forth no evidence of either. Various students were upset by Schmidt's speech, but the "'mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint' cannot justify the prohibition by school officials of a particular expression of opinion". *Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir. 1996) (citing *Tinker*, 393 U.S. at 509); *see also Saxe*, 240 F.3d at 212 ("[I]f school officials were permitted to prohibit expression to which other students objected, absent any further justification, the officials would have a license to prohibit virtually every type of expression").

Schmidt's speech was expressive, with the intent to convey a particular message. Schmidt mentions Artemis Langford by name, but that is unavoidable, as the debate revolves around the propriety of a particular biological male participating in an activity—joining a sorority—traditionally reserved for biological females. Schmidt does not misgender Langford to denigrate her, but to debate a public issue. Normally, mentioning a student by name or ignoring a student's requested pronouns has low expressive value. *See* Emily Gold Waldman, *A Post-Morse Framework for Students' Potentially Hurtful Speech (Religious and Otherwise)*, 37 J.L. & Educ. 463, 492-95 (2008) (distinguishing between ad hominem derogatory personally directed verbal attacks on other students and general political, social, or religious commentary). Outside of a debate about gender, misgendering

is of limited communicative value. *See Parents Defending Educ.*, 2023 WL 4848509 at *13 (distinguishing between misgendering as verbal bullying and sincere civil discussions about transgender issues).

Here Schmidt's speech is part of an earnest debate about gender identity, a matter of public importance.[11] "Gender identity . . . [is a] sensitive political topic[] and . . . undoubtedly matter[] of profound value and concern to the public. . . . Such speech occupies the highest rung of the hierarch of First Amendment values and merits special protection." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (cleaned up). "Speech on matters of public concern is at the heart of the First Amendment's protection. . . . [I]t is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (cleaned up). This is particularly true on college campuses because they are the "marketplace of ideas". *Healy v. James*, 408 U.S. 169, 180 (1972). While elementary and public schools prioritize the inculcation of social values, universities seek to encourage inquiry and the challenging of *a priori* assumptions. *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010).

Therefore, this Court finds that Schmidt's speech is protected free expression and not harassment or discriminatory conduct. We must ask if the University could still ban his speech on the basis that it was not the appropriate forum for such speech.

B. *Forum analysis and Viewpoint Discrimination*

---

[11] Googling "'Artemis Langford" AND "University of Wyoming"' produces thousands of results.

The University Officials argue that even if Schmidt's speech is not harassment, but protected speech, his speech in the Union breezeway was in a limited public forum and that the school's neutral discrimination policy was a reasonable policy in that forum. Schmidt counters that the breezeway is not a limited public forum, but a designated public forum and that he experienced unconstitutional viewpoint restriction.

The Supreme Court has laid out various constitutional standards regarding to what extent the government may restrict speech on its property, depending on the type of property or forum. In *Doe v. City of Albuquerque*, the Tenth Circuit explained that there are four types of forums: (1) traditional public forums ("streets and parks which have immemorially been held in trust for the use of the public"), (2) designated public forums ("public property which the State has opened for use by the public as a place for expressive activity"), (3) limited public forums (a sub-category of designated public forum, "property limited to use by certain groups or dedicated solely to the discussion of certain subjects"), (4) nonpublic forums ("public property which is not by tradition or designation a forum for public communication"). 667 F.3d 1111, 1128 (10th Cir. 2012).

Designated public forums allow general access or indiscriminate use of the forum "whether by the general public, certain speakers, or for certain subjects." *Id.* at 1129-30 (holding that a public library was a designated public forum because it was open to the public to receive information without any need for pre-approval). On the other hand, a limited public forum is reserved for the discussion of certain topics or certain speakers only. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); *see*

14

*also Alpha Delta Chi–Delta Chapter v. Reed*, 648 F.3d 790, 798 (9th Cir. 2011) (finding a limited public forum when the forum was only open to university-approved student groups).

Here, because University breezeway tables are not open to the general public and a reservation is required for use, this Court finds that the breezeway tables are a limited public forum. However, the ultimate conclusion does not hinge on this finding because, as explained below, the Court finds that Schmidt experienced viewpoint discrimination, and viewpoint discrimination is not permissible in limited or designated public forums.

Content discrimination, *i.e.*, discrimination against speech because of its subject matter, is different than viewpoint discrimination, *i.e.*, discrimination because of the speaker's specific motivating ideology, opinion, or perspective. *Rosenberger*, 515 U.S. at 820. Viewpoint discrimination is presumed impermissible. *Id*. In a designated public forum, the government may only impose content and viewpoint-neutral time, place, and manner restrictions. *Doe*, 667 F.3d at 1130-31. In a limited public forum, the government may still not engage in viewpoint discrimination, but may engage in content discrimination however, if it is "reasonable in light of the purposes served by the forum." *Good News Club v. Milford Central School,* 533 U.S. 98, 106-107 (2001).

Viewpoint discrimination is heavily disfavored, regardless of forum. Viewpoint discrimination is "an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at

828-29; *see also Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys."); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *see also Matal v. Tam*, 528 U.S. 218, 243 ("Giving offense is a viewpoint.").

Here, Schmidt wishes to express his viewpoint that Artemis Langford is a male and to debate the propriety of Langford's participation in a sorority. This is a viewpoint. The University counters that it allowed Schmidt to keep the remainder of his sign that did not contain Langford's name. However, without Langford's name Schmidt is unable to fully express his views regarding Langford's sex specifically. Students approached Schmidt's table to debate his views on Langford's sex. Presumably some of these students have views opposed to those of Schmidt and believe that Langford is female and belongs in a sorority. There is no indication that those students were prohibited from debating Schmidt or speaking Langford's name. Therefore, the University appears to be favoring one viewpoint over another. *See Barr v. Lafon* 538 F.3d 554, 572 (6th Cir. 2008) (holding policy viewpoint neutral which banned the display of a Confederate flag whether displayed by one in solidarity with its message or by one displaying the flag in a circle with a line drawn through it); s*ee also Rodriguez*, 605 F.3d at 710-11 (holding that application of harassment policy to professor's racially charged emails constituted viewpoint discrimination).

The University counters that its non-discrimination policy is viewpoint neutral. University officials cite to *Roberts v. U.S. Jaycees* for the proposition that a state law prohibiting discrimination on the basis of various protected characteristics was not viewpoint discriminatory. 468 U.S. 609, 623-24 (1984). University Officials also cite to *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez* for a similar proposition. 561 U.S. at 694 (holding that University's requirement that all student groups accept all applicants was viewpoint neutral). However, both of those cases involved policies "unrelated to the suppression of expression." *Roberts*, 468 U.S. at 624. Here, the University's policy is directly related to Schmidt's speech, and, as already explained above, his speech is not discriminatory. Therefore, while the University's policy in other contexts may be viewpoint neutral, here it was not.

Because Schmidt's speech is protected free expression and he experienced unconstitutional viewpoint discrimination we find Schmidt has made a strong showing that he is likely to prevail on the merits of his claim. Because this is the most important factor, we now turn only briefly to the other factors.

2.   Irreparable Harm

The Supreme Court has instructed that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Awad*, 670 F.3d at 1131 ("[W]hen an alleged

constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Therefore, Schmidt is experiencing irreparable harm.

### 3.  Balance of Harms

Regarding the third factor, the balance of harms, because Schmidt has filed a motion for a disfavored injunction, one that changes the status quo, Schmidt must make a "strong showing" that the threatened injury outweighs injury to the University caused by granting an injunction. *Willey v. Sweetwater Cnty. Sch. Dist.*, 2023 WL 4297186, at *25 (D. Wyo. June 30, 2023) (citing *Awad*, 670 F.3d at 1131).

The University argues that the balance of harms weighs in its favor because it has a compelling interest in providing a campus free from discrimination and harassment. *See Saxe*, 240 F.3d at 209 ("Certainly, preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest."). Furthermore, it claims it risks litigation and loss of federal funding if it does not comply with Title IX. In addition, the University argues that Schmidt can share his message elsewhere on campus.

As already explained above however, Schmidt's speech is not discriminatory or harassment. And therefore, the University faces little risk of adverse Title IX litigation. While Schmidt could possibly share his message elsewhere on campus, this injunction concerns not just the location of his speech, but the content of his speech as well. In addition, the breezeway appears to afford unique opportunities for one-on-one engagement communication. *McCullen v. Coakley*, 573 U.S. 464 (2014) (holding that

one-on-one communication while leafletting was the most effective, fundamental avenue of political discourse, the essence of First Amendment expression, and no form of speech was entitled to greater constitutional protection).

Therefore, this Court finds that Schmidt has made a strong showing that the balance of harms weighs in his favor.

### 4. Public Interest

The University argues that granting Schmidt's preliminary injunction would not be in the public interest because it would allow Schmidt to discriminate and harass University students. The University also argues that it has a strong public interest in complying with anti-discriminatory and anti-harassment laws.

However, as we have already explained above, Schmidt's behavior does not constitute harassment and therefore this factor does not weigh in favor of the University.[12]  Furthermore, "[v]indicating First Amendment freedoms is clearly in the public interest." *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005); *see also Awad*, 670 F.3d at 1132 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). Therefore, we find that granting the preliminary injunction is in the public interest.

---

[12] The granting of Schmidt's preliminary injunction does not diminish the University's ability to sanction possible future misbehavior by Schmidt, such as continuing to engage with students who do not wish to speak with him. "There is no constitutional right to be a bully." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264 (3d Cir. 2002).

**Conclusion**[13]

For the foregoing reasons, the Court enjoins the UW Officials, and their agents, from censoring Schmidt's views on the sexual identity of Artemis Langford and enjoins the application of the ban on tabling currently in effect. Accordingly, the Court hereby Orders that:

Plaintiff's Motion for a Preliminary Injunction (ECF 8) is GRANTED.

Dated this 18th day of August, 2023.

NANCY D. FREUDENTHAL
UNITED STATES SENIOR DISTRICT JUDGE

---

[13] We do not address Schmidt's argument that UW's policies violate the Due Process clause of the Fourteenth Amendment because we grant his requested relief on other grounds.